IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 3:20CR110 |
| Plaintiff, | : | JUDGE THOMAS M. ROSE |
| v. | : | |
| ARLAND MILLS, | : | |
| Defendant. | : | |

## UNITED STATES' SENTENCING MEMORANDUM

Now comes the United States of America, by and through the undersigned Assistant United

States Attorney, and respectfully provides the following sentencing memorandum.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/Amy M. Smith
AMY M. SMITH (0081712)
Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
(937) 225-2910
Fax: (937) 225-2564
Amy.Smith2@usdoj.gov

## MEMORANDUM

## <u>INTRODUCTION</u>

In crafting a sentence pursuant to 18 U.S.C. § 3553(a), the Court takes into account: 1) the nature and circumstances of the offense, and history and characteristics of the defendant, 2) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense, 3) the need to adequately deter criminal behavior, 4) the need to protect the public from future crimes of defendant, 5) providing rehabilitative services to defendant, 6) the kinds of sentences available, 7) the kinds of sentence and sentencing range established by the Sentencing Guidelines for the offense (and any pertinent policy statements), 8) restitution needs, and 9) the need to avoid unwarranted disparities among similarly situated defendants. The Court may place greater weight on certain factors as opposed to others. *United States v. Zobel*, 696 F.3d 558, 571 (6th Cir. 2012).

The government requests that the Court sentence Defendant Arland Mills ("Mills") to a sentence within the government's calculated guideline range. The government disagrees with and objects to aspects of Probation's calculation of the sentencing guideline range as set forth in the Final PSR. The government's position on the sentencing calculation is further set forth below along with factual/legal support.

## <u>THE GUIDELINE CALCULATION</u>

The government asserts that a net offense level of 29 should apply, based upon the following calculation:

**20** Base offense level § 2K2.1(a)(4)

**+4** 8-24 guns § 2K2.1(b)(1)(B)

**+4** Either § 2K2.1(b)(5) (trafficking) or § 2K2.1(b)(6)(B) (transfer firearm with belief it may be used in another felony offense)

**+2**     Aggravated Role § 3B1.1(c)

**+2**     Obstruction § 3C1.1

**32**

**-3**     Acceptance of Responsibility and Timely Plea § 3E1.1(a) and (b)

**29**     Net offense level

With a criminal history category of I, the sentencing guideline range in this matter would be 87 – 108 months imprisonment.

## I.    Base Offense Level

The government disagrees with Probation's recommendation of a base offense of 12. The government believes that a base offense level of 20 should apply, pursuant to U.S.S.G. § 2K2.1(a)(4), based upon:

> (B) the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; ... and (ii) defendant ... (III) is convicted under 18 U.S.C. § 922(a)(6) or § 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person[.]

A semiautomatic firearm that is capable of accepting a large capacity magazine is defined in § 2K2.1 Application Note 2 as being "a semiautomatic firearm that has the ability to fire multiple rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm."

At the sentencing hearing, Agent Remick-Cook testified regarding his investigation into the three firearms recovered from Ruskin Road on the night of November 4, 2019, where Detective

3

DelRio (who was also a DEA Task Force Officer) had been shot during the execution of a federal search warrant. (R. 22, Transcript of 5/24/21 hearing). These three firearms included two FN model 5-7 pistols and one ATI Omni Maxx 5.56-millimeter pistol. (*Id.* at PAGEID 202). Agent Remick-Cook testified that he received confirmation from the manufacturers that one of the FN firearms involved (serial number ending 4252) was shipped with a 20-round magazine and that the ATI Omni Maxx was shipped with a 30-round magazine. (*Id.* at PAGEID 227-28, see also Gov't Exhibits A and B). Finally, Agent Remick-Cook testified that all three firearms recovered from Ruskin Road had high-capacity magazines – each firearm had a 30-round magazine either attached to the pistol or in the box with the ATI Omni Maxx. (*Id.* at PAGEID 228). Thus, the first prong is satisfied.

The second prong requires that Mills, at minimum, needed reason to believe the offense would result in the transfer of a firearm to a prohibited person. The legal standard "reason to believe" is used throughout U.S.S.G. § 2K2.1, but it is undefined; thus it should be given its ordinary meaning. *See, e.g., United States v. Sweeney*, 891 F.3d 232, 237-38 (6th Cir. 2018) (applying ordinary meaning of "parent" in resolving a guideline application issue). The Court can determine whether a defendant had a "reason to believe" based on the totality of the circumstances and reasonable inferences derived therefrom. *United States v. Torres*, 644 Fed.Appx. 663, 667 (6th Cir. 2016); *see also United States v. Ilarraza*, 963 F.3d 1, 12 (1st Cir. 2020); *United States v. Garcia*, 635 F.3d 472, 478 (10th Cir. 2011); *United States v. Juarez*, 626 F.3d 246, 251 (5th Cir. 2010). While "reason to believe" is undefined in § 2K2.1(a)(4)(B), this same standard is used in other sections of § 2K2.1, and several cases set forth the type of knowledge sufficient to trigger a "reason to believe."

The evidence and logical and reasonable inferences derived therefrom support the finding that Mills had reason to believe the firearms he straw-purchased would be transferred to a prohibited person.

**A. Mills used a straw purchaser despite being able to lawfully buy firearms.**

Mills could lawfully purchase firearms. (R.22, Transcript 5/24/21, PAGEID 296-97). Mills was previously employed by a Federal Firearms Licensee (FFL). (*Id.* at PAGEID 292-99). Thus, Mills would have also known that the law required him to purchase the guns for himself if he were the true purchaser. Mills would further have known that when had he purchased the firearms, an ATF Form 4473 would have been created linking him to the purchases, and Mills would have known that making a false statement on the ATF Form 4473 is a federal crime. Moreover, Mills told agents that he knew about straw purchasing when interviewed but advised that none of his firearms would have been purchased with a straw buyer. (*Id.* at PAGEID 239-40).

Additionally, Mills' use of a straw buyer meant additional effort to purchase the firearms beyond what it would have taken do it himself. Mills sent emails, sent text messages, had phone calls, and scheduled dropping off money/picking up firearms to obtain these firearms. The logical inference is that Mills engaged in this conduct to insulate himself from the transaction. He could have lawfully bought the firearms himself, but he engaged in criminal activity (using a straw buyer). The reasonable inference is that Mills knew or had reason to believe that the firearms were going to be transferred to a prohibited person.

**B. Individual-1 could lawfully buy firearms but ordered them through Mills.**

Individual-1 was not prohibited from lawfully buying firearms. (*Id.* at PAGEID 300). By Mills's own statements, he had known Individual-1 for 10 years and had been friends with him from when Mills worked at the firearms store. (Gov't Exhibit 6A). Based on his familiarity with

Individual-1, Mills knew or had reason to believe that there would be no lawful reason for Individual-1 to repeatedly purchase these types and quantities of firearms through Mills, when Individual-1 could have just easily bought them through an FFL himself.

During the initial interview with Mills, he described selling a firearm (an FN Model 5-7 consistent with one of the straw-purchased weapons) to a "friend of his" with Individual-1's first name. (*Id.* at PAGEID 238-39, Gov't Exhibit 6A). However, in that interview, Mills also claimed he did not know the person's last name. (Gov't Exhibit 6A). Mills made this claim despite Individual-1's full first and last name programmed as contacts in Mills' phone. (R.22, Transcript 5/24/21, PAGEID 251-53). Mills' wife was present at the interview, and she made statements about that same individual, which demonstrated her familiarity with Individual-1 as well. (Gov't Exhibit 6A).

When analyzing the toll data between Mills and the individuals charged in the shooting death of Det. DelRio, there is one common phone number - Individual-1. (*Id.* at PAGEID 281-87). There was a conversation between Individual-1 and Mills on the day before the August 10, 2019 transfer of an FN as well as several communications with Individual-1 the day after the August 10, 2019 transfer. (*Id.* at PAGEID 286-87). The timing of the contact between Individual-1 and Cahke Courtner suggests: 1) the FN firearm with serial number 2788 which had been obtained by Delano Wells ("Wells") on August 10, 2019 was transferred shortly thereafter to Mills, 2) Mills then transferred the FN to Individual-1, and 3) Individual-1 then transferred the FN to Cahke Courtner on August 17, 2019. (*Id.* at PAGEID 217-18, 283-85).

While the actual content of text messages between Individual-1 and Mills could not be recovered by the ATF, the evidence suggests that Individual-1 ordered the firearms specifically through Mills. The phone toll data between Wells/Mills/Individual-1, and the content of the

communications between Wells and Mills, all support the conclusion that Individual-1 selected particular firearms. After receiving a specific order, Mills then instructed Wells to buy those same particular firearms.

### C. Mills paid more than market price for the firearms.

As noted above, Mills could have lawfully purchased these firearms himself. However, he utilized Wells to complete the purchase. In doing so, he paid on average $25 per firearm to Wells. (R.21, Transcript 4/21/21, PAGEID 130). Wells estimated making "roughly $750. Maybe more." from purchasing these firearms for Mills. (*Id.* at PAGEID 171). One does expend this additional effort and costs without there being a need to do so. The reasonable inference from these actions is that Mills tried to insulate himself from the purchase of these firearms. The other reasonable inference is that Mills had reason to believe those firearms were going to be transferred to a prohibited person.

### D. An extremely short time elapsed between the date the guns were purchased and the date they were recovered at Ruskin Road.

Agent Remick-Cook explained that "time to crime" is a marker that ATF uses which identifies the amount of time that elapsed from the date a firearm was transferred to a private citizen until the time that firearm was recovered during a criminal investigation. (R.22, Transcript 5/24/21, PAGEID 218). The time-to-crime is significant because the vast majority of firearms are purchased by buyers with the intent of keeping them for personal use. (*Id.* at PAGEID 218-19). Of the three firearms recovered from Ruskin Road and originally transferred to Wells, the time-to-crime was 86-days, 67-days, and 57-days. (*Id.* at PAGEID 219-24). As Agent Remick-Cook explained, a year or less is considered a short time-to-crime for the area. (*Id.* at PAGEID 225). Furthermore, the recovery of three firearms at the same crime scene, purchased separately but by the same original buyer, in such a short time-to-crime is indicative of firearm trafficking. (*Id.* at

PAGEID 225).  The evidence recovered from the cell phone data and the short time-to-crime period establishes that Mills never intended to keep the firearms for any significant period of time.

### E.  Mills purchased multiple of the same high-powered firearms.

SA Remick-Cook testified regarding the FN 5-7 firearms as well as the ATI Omni Maxx firearm that were recovered at Ruskin Road.  (*Id.* at PAGEID 207).  He described the FN 5-7 as being commonly used by law enforcement and foreign militaries because of its effectiveness in short-range combat.  (*Id.* at PAGEID 208).  It uses an armor-piercing round capable of piercing soft body armor.  (*Id.*).  Furthermore, over time it has developed the nickname of "cop killer" and has become increasingly popular among higher-end narcotics traffickers as they typically cost $1000. (*Id.* at PAGEID 208-09).  Agent Remick-Cook testified that ATI Omni Maxx is an AR-style pistol. (*Id.* at PAGEID 209).  He testified that it is highly collectible in the civilian market and very popular in military applications.  (*Id.*).  He further testified that it also has become more popular with the criminal community due to its concealability within vehicles and close quarters (size and ease of mobility).  (*Id.* at PAGEID 210).  These are relatively powerful firearms designed for use against people (by law enforcement and military) but also commonly desired by criminals.

Based on the nature of the transactions, all of these firearms were purchased from internet sources.  (R.21, Transcript 4/21/21, PAGEID 131, 150, 153-56, 158, Gov't Exhibit 2).  There is nothing to suggest that any of these firearms were particularly difficult to obtain or unique, as Wells found them for sale at different websites and purchased multiple of these firearms when requested by Mills to do so.  (Gov't Exhibit 2).  Here, Mills - via Wells - bought multiple FN 5-7 firearms and multiple ATI Omni Maxx firearms in single transactions.  Mills clearly did not collect and keep these firearms.  The very nature of the purchases themselves is indicative of trafficking.

**F. Mills deleted his communications with Individual-1 after the ATF contacted him following the recovery of the firearms at Ruskin Road.**

As explained in further detail below as it relates to the Obstruction of Justice enhancement, Mills deleted records from his cellular phone. Based on the timing of the communications and contents that had been deleted, it is reasonable to infer that Mills did so after ATF agents came to Mills home on November 5, 2019. In particular, Mills specifically deleted communications between himself and Individual-1, Mills deleted his contacts of Individual-1, and Mills deleted his call entire log up to November 5, 2019.

If Mills believed these were legitimate firearms transactions, he lacked reason to specifically erase this data. Furthermore, if the statements regarding the sale of the three firearms that Mills made in his November 7, 2019 were true, there would be no need to hide his association and communications with Individual-1. Thus, Mills' actions in deleting these cell phone records supports that Mills, at a minimum, had reason to believe that he was transferring the firearms knowing that the firearms would be subsequently transferred unlawfully.

**G. When interviewed, Mills gave false information to the agents.**

Mills provided false information to agents during his November 5, 2019 interview as well as his November 7, 2019 interview. Mills initially told agents that he had not messed with any guns in a while and had not sold any to anybody in several months. (R.22, Transcript 5/24/21, PAGEID 237, Gov't Exhibit 6A). As noted above during the November 5, 2019 interview, Mills later said he sold an FN to a guy and identified him by first name (which is the same first name as Individual-1), and who was a friend of his that he'd known 10 years. (Gov't Exhibit 6A). Mills denied knowing that individual's last name – despite a last name having been programmed into his phone. (*Id.*).

During the November 7, 2019 interview, Mills told agents he sold all three firearms to a black guy whose name he does not know while in the parking lot of a flea market known as "Show-Me's" about two to three weeks prior.  (Gov't Exhibit 7A).  Mills said he had no idea what this individual's name was and had no idea where this guy was from.  (*Id.*).  He also denied having sold any of these firearms to a person he previously identified.  (*Id.*).  Mills further denied having ever said anything related to that person and denied knowing anyone with that person's name. (*Id.*).  This information is inconsistent with the information Mills told in the November 5, 2019 interview as well as the recovered contents of his phone.

During the November 7, 2019 interview, agents advised Mills that it was a federal crime to lie to a federal agent.  (*Id.*).  Mills acknowledged knowing that it was a crime.  (*Id.*).  Mills risked being charged with a federal falsification offense in an attempt to hide the true nature of his transactions regarding the firearms recovered at Ruskin Road.  The reasonable inference is that Mills destroyed those communications to hide his involvement because he knew or had reason to believe that the firearms were going to be transferred to a prohibited person.

In sum, the facts and circumstances of the firearm purchases show that the firearms were trafficked with the intention of providing them to a "nefarious source."  (R.22, Transcript 5/24/21, PAGEID 299).  Mills, who had knowledge of firearm laws and the required ATF forms, would have known to create a buffer between himself and the firearm if he knew the firearm was going to be transferred to a prohibited person.  (*Id.* at PAGEID 298-99).  Mills' actions in using a straw buyer and paying a premium are not consistent with a legitimate purchase. The contents of Mills' cell phone (and the deletions from it) also show these purchases were not for a legitimate purpose.

The most reasonable explanation for Mills' actions was that he was attempting to insulate himself from these firearms being traced back to him because he had reason to believe the firearms

were subsequently going to be transferred to a prohibited person. Thus, this second prong is supported by a preponderance of the evidence and the base offense should be calculated at 20.

## II.    Enhancement for 8-24 guns § 2K2.1(b)(1)(B)

The government agrees with Probation's recommendation that the enhancement under § 2K2.1(b)(1)(B) for a 4-level increase is appropriate as 8-24 guns are involved in the offense. Here, the evidence shows that more than eight (8) firearms were purchased by Wells for Mills. Wells testified regarding Government Exhibits 3A through 3E. (R.21, Transcript of 4/21/21 hearing, PAGEID 163-69). Those ATF Form 4473 documents show a total of one (1) FN pistol (Gov't 3B), two (2) FN pistols (Gov't 3C), six (6) ATI Omni Maxx  pistols (Gov't 3D), and two (2) Ruger rifles (Gov't 3E) for a total of 11 firearms. (*Id.*). Furthermore, Mills agreed that Wells purchased more than eight (8) firearms in his statement of facts, attached to the Plea Agreement. (R.8, Plea Agreement, PAGEID 26). Thus, this enhancement is supported by the preponderance of the evidence.

In addition to the firearms, ATF Form 4473 documents also reflect eight (8) Anderson lower receivers (Gov't 3A) and Agent Remick-Cook testified that he was unable to obtain the ATF Form 4473 for all of the lower receivers, suggesting that there could be upwards of twenty total. (R. 22, Transcript of 5/24/21 hearing, PAGEID 295).

## III.    Enhancement for trafficking § 2K2.1(b)(5) or the transfer with reason to believe it would be used in another felony § 2K2.1(b)(6)(B).

The government objects to Probation failing to include an enhancement under § 2K2.1(b)(5) or § 2K2.1(b)(6)(B). The government believes that one of these enhancements should apply.

**A.  § 2K2.1(b)(5) four-level trafficking enhancement.**

§ 2K2.1(b)(5) provides for a 4-level increase for trafficking in firearms. As explained in

Application Note 13, this applies when:

> (A) In General – Subsection (b)(5) applies, regardless of whether anything
> of value was exchanged, if the defendant –
>
> (i)     transported, transferred, or otherwise disposed of two or more
>         firearms to another individual, or received two or more firearms
>         with the intent to transport, transfer, or otherwise dispose of firearms
>         to another individual; and
> (ii)    knew or had reason to believe that such conduct would result in the
>         transport, transfer, or disposal of a firearm to an individual –
>         (I)     whose possession or receipt of the firearm would be
>                 unlawful; or
>         (II)    who intended to use or dispose of the firearm unlawfully.

A person whose "possession would be unlawful" is somewhat narrowly defined, requiring the

other person have a prior conviction for domestic violence, a crime of violence, or controlled

substance offense as defined in § 4B1.2, or that they were under some form of parole or other court

supervision. § 2K2.1, Application Note 13(B).  "[I]n applying the trafficking enhancement in this

manner, a court looks, not to what actually happened to the firearms, but instead to the

circumstances known to the defendant." *United States v. Asante,* 782 F.3d 639, 644 (11th Cir.

2015).  The Sixth Circuit has also held that "in order for § 2K2.1(b)(5) to apply [] there must be a

relationship between the firearms that form part of the relevant conduct and the firearms that are

part of the offense of conviction." *United States v. Freeman*, 640 F.3d 180, 189 (6th Cir. 2011)

(internal citation and quotation omitted)

A variety of cases provide examples of when a defendant had "reason to believe" that the

transfer of guns was to either a prohibited person or one who intended to use them in a crime.  In

*United States v. Juarez*, 626 F.3d. 246, 251 (5th Cir. 2010), the trafficking enhancement was

applied to a person who straw-purchased several guns that ended up unlawfully smuggled across

the border to Mexican gang members. Juarez (who lived near the U.S./Mexico border) spoke with "El Mano" by cell phone and later met him at a local family center. *Id*. at 249-50. El Mano gave Juarez a vehicle and cash, which Juarez used to buy guns at a nearby gun store. *Id*. at 249. Juarez asserted she was the true purchaser on the ATF Form 4473, took possession of the guns, and then provided El Mano with the guns at a nearby location. *Id*. El Mano paid Juarez $200 per gun. *Id*. Ultimately, El Mano terminated the scheme, telling Juarez that law enforcement interest was "too hot." *Id*. Some of Juarez's guns were recovered in Mexico. *Id*.

The Fifth Circuit held that no clear error resulted from applying the § 2K2.1(b)(5) enhancement, because Juarez had "reason to believe" that her conduct would result in the transfer of the firearms to a person who intended to use or dispose of them unlawfully. *Id*. at 252. The court pointed to the facts that El Mano (whose real name Juarez did not know) would not buy the guns himself, that El Mano sent Juarez alone to buy the guns (hiding his involvement), the clandestine nature of their meetings, the significant premium El Mano paid Juarez for each gun, and the military-style type and volume of guns (twenty-five) purchased in support of finding that Juarez had "reason to believe" that the firearms were being purchased for an unlawful purpose. *Id*.

A court may draw "common-sense inferences from the circumstantial evidence." *Id.* at 256; *see also*, *United States v. Garcia*, 635 F.3d 472 (10th Cir. 2011) (concluding the district court did not err when it inferred from circumstantial evidence that defendant knew or had reason to believe the firearms would be disposed of unlawfully); *United States v. Martinez-Guerra*, 830 Fed.Appx. 140 (5th Cir. 2020) (concluding the record revealed sufficient evidence from which the district court could infer defendant had reason to believe the firearms were being purchased for an unlawful purpose); *United States v. Mena*, 3342 Fed.Appx. 656, 658 (2nd Cir. 2009) (concluding that Mena knew or had reason to believe that the firearms were to someone who intended to use

or dispose of the firearms unlawfully). Furthermore, "§ 2K2.1(b)(5) does not require a defendant's knowledge of a specific offense to be committed." *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir. 1994) (concluding that sales of firearms to drug users and drug dealers "leaves no doubt that he knew the guns were being used in connection with another felony offense").

In *United States v. McMillar*, 518 Fed.Appx. 867, 868-869 (11th Cir. 2013) (per curiam), the enhancement applied even though the buyers were in fact undercover officers. McMillar sold some drugs to the undercover officers as well as multiple (the quantity is not defined) firearms. *Id*. at 869. During their interactions, the undercover officers told McMillar that they sold guns for a significant profit in New York, and wanted smaller guns that could be concealed. *Id*. The Eleventh Circuit found no clear error in applying the enhancement based on these facts. *Id*.

In the cases cited above, those defendants were the straw buyers and denied knowing the ultimate purpose/destination for the guns, yet were nonetheless held accountable for the trafficking enhancement based on the nature and circumstances of the transactions. Compared to *Juarez*, Mills is much more like "El Mano" (the more culpable offender) than Juarez (the straw buyer). Mills knew the firearm purchase laws, Mills used a straw buyer by directing Wells to purchase the 11 firearms (nine of which were designed primarily for use against people), Mills selected the gun types and quantity, Mills selected military-style weapons, Mills paid Wells additional money per gun for Wells to make the purchases, Mills destroyed evidence on his phone, and Mills transferred the firearms to Individual-1 within a short timeframe.

Furthermore, based on the timeline of the communications, a pattern of communication between Mills and Individual-1 exists. (Gov't Exhibit 12). Prior to Mills telling Wells to purchase the FN's and the ATI Omni Maxx firearms, Mills communicates with Individual-1. (*Id.*). He then

communicates with Individual-1 after each purchase is placed and after the firearms are collected from the FFL. (*Id.*).

Agent Remick-Cook testified that the communications from Individual-1 to Mills, followed by orders being placed with Wells was an indicator of trafficking. (R.22, Transcript 5/24/21, PAGEID 347). This pattern of communication clearly suggests that Individual-1 placed an order for each of the three firearms recovered at Ruskin Road. But for Mills' actions in deleting the MMS messages between him and Individual-1, those communications would have been available for the Court's consideration. Mills took affirmative steps to delete these communications for a reason, and it is reasonable to infer that the reason was because those communications contained evidence that would have shown Mills' knowledge as to the true nature of the transactions.

Three of the firearms (which were all purchased on different days) were recovered less than 90 days after each had been purchased. They were found in a room full of drugs and large quantities of U.S. currency, and one of these firearms was used to kill Det. DelRio. Based on the phone data and short recovery time, Mills clearly transferred the firearms to Individual-1 within days of obtaining them, which is further evidenced by the fact only a few of the other firearms Wells bought were in Mills' possession when ATF searched Mills' house (indicating he sold those quickly too). (R.22, Transcript 5/24/21, PAGEID 247).

Thus, based on Mills' conduct and the nature of the transactions, the indirect evidence, and the reasonable inferences that are drawn from that, the Court should conclude that Mills had reason to believe both (a) the firearms would be used for an unlawful purpose (*i.e.*, drug trafficking), and (b) would be transferred to a person whose possession was unlawful. The Court should find the 4-level trafficking enhancement under § 2K2.1(b)(5) applies.

**B. Alternative § 2K2.1(b)(6)(B) four-level enhancement.**

Alternatively, pursuant to § 2K2.1(b)(6)(B), the Court can apply a 4-level enhancement if Mills:

> …possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.

The Commentary to § 2K2.1 specifically address situations where the other felony offense relates to drug trafficking, stating "Subsection (b)(6)(B) appl[ies] …(ii) in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia" because the "presence of the firearm has the potential of facilitating another felony offense." § 2K2.1, Application Note 14(B).

Here, large amounts of narcotics and United States currency were both found in Ruskin Road along with the three firearms. (R.22, Transcript 5/24/21, PAGEID 203-207, Gov't Exhibits 4A-4L). Three of firearms purchased by Mills (through Wells) were in that room, including the one used to kill Det. DelRio. Drug trafficking is a felony under both federal and state law. See, 21 U.S.C. 841(a)(1); Ohio Rev. Code § 2925.03.

Based on the facts and circumstances of the communications and the transactions, Mills had reason to believe the firearms transferred to Individual-1 were destined for an unlawful purpose.

**IV.** <u>**Aggravated Role**</u>

The government agrees with Probation's position that a 2-level enhancement for aggravated role (leader/organizer) pursuant to § 3B1.1(c) applies in this case. If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in previous subsections, an aggravating role adjust of 2 levels is appropriate. U.S.S.G. § 3B1.1(c).

The Sixth Circuit has applied the enhancement when a defendant has exerted control over at least one individual within the criminal organization. *United States v. Caseslorente*, 220 F.3dd 727, 736 (6th Cir. 2000) (finding that defendant's role enhancement was proper when evidence showed that defendant directed one other person with respect to the criminal activity). In determining whether the § 3B1.1(c) sentencing enhancement applies, a district court should consider the following factors:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt 4. See also, *United States v. Lalonde*, 509 F.3d 750, 765 (6th Cir. 2007).

The government showed through the evidence that Mills was a leader/organizer in this crime. Wells testified that Arland Mills provided instructions to Wells about what firearms to purchase, how many to purchase, which websites to purchase from, and how much to spend as well as providing the money for the purchase (with an additional fee to Wells). (R. 21, Transcript of 4/21/21 Hearing, PAGEID 131-34, 148, 150-53, 156-61, 161-88 and Gov't Exhibit 2). Based on the evidence, it is clear that Mills maintained the decision-making authority in purchasing the firearms; Mills authorized the transactions prior to Wells making a purchase; Wells was given a small transaction fee (approximately $25 per firearm); and Wells was unaware of what Mills intended to do with the firearms once transferred to him. (R.21 at PAGEID 131-34, 170). Wells purchased these firearms because Mills directed Wells to do so. (*Id.* at PAGEID 166-70). Based on a preponderance of the evidence regarding the factors for consideration, this enhancement is also established.

## V.  <u>Obstruction of Justice</u>

The government agrees with Probation's position that a 2-level enhancement for obstruction of justice pursuant to § 3C1.1 applies in this case.  Obstruction of justice includes the acts of "destroying or concealing or directing or procuring another to destroy or conceal evidence that is material to an official investigation or judicial proceeding (*e.g.*, shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so [.]"  U.S.S.G. § 3C1.1, Application Note 4(D).

As described during the sentencing hearing, law enforcement arrived at Mills' door in the early hours of November 5, 2019.  (R.22, Transcript 5/24/21, PAGEID 235).  Law enforcement questioned Mills about the firearms and straw purchases.  (*Id.* at PAGEID 235-41, Gov't Exhibit 6A).  During the conversation, Mills ultimately admitted to selling an FN to a person whose first name was provided and whose full identity is now known to law enforcement but who has been referred to throughout the hearing and related exhibits as Individual-1.  (R.22 at PAGEID 238).  At the conclusion of the conversation with Mills on November 5, 2019, law enforcement asked Mills to have his attorney contact agents.  (*Id.* at PAGEID 241).

Agents subsequently returned to Mills' residence two days later, on November 7, 2019.  (*Id.*).  When agents arrived on November 7, 2019, they had a federal search warrant for Mills' residence.  (*Id.*).  During the search warrant, agents seized Mills' cellular telephone.  (*Id.* at PAGEID 248).  A subsequent search warrant for the phone was obtained and phone examiners attempted to extract the data from Mills' phone.  (*Id.*).

During a review of the extraction from Mills' phone, it was observed that there were items that had been deleted.  (*Id.* at PAGEID 248-49).  Some, but not all, of the deleted items were recovered during the extraction process.  (*Id.* at PAGEID 248-77, Gov't Exhibit 8 - 12).  Notably,

Mills deleted contacts that related to Individual-1; Mills deleted MMS messages that he had exchanged with Individual-1; and Mills deleted his entire call log which included calls to and from Individual-1 up to November 5, 2019. (*Id.*).

Although, agents and examiners are unable to identify a date and time of a deleted item, they nevertheless had information suggesting a deleted date. (*Id.* at PAGEID 276). In reviewing the non-deleted call log, the calls still present on the phone commence on November 5, 2019 after law enforcement had left Mills' residence for the day and the calls continued through until law enforcement seized the phone on November 7, 2019. (*Id.* at PAGEID 277).

The destroying or attempt to destroy evidence that is material to an official investigation is "covered conduct" as set forth in Application Note 4(D) of U.S.S.G. § 3C1.1. Agent Remick-Cook explained how the communications that Mills had with Individual-1 were relevant and material to his investigation as well as the ongoing murder investigation by FBI. (R.22, Transcript 5/24/21, PAGEID 277-91, 299-300). Mills' actions were not only obstructive as it related to the investigation into his own actions regarding these firearms. Equally important is how Mills' actions obstructed the investigation into Individual-1's actions and communications, which is still pending and ongoing.

The Sixth Circuit has applied the obstruction enhancement in circumstances similar to Mills' acts. In *United States v. Boyd*, 312 F.3d 213 (6th Cir. 2002), Boyd was on probation for sex offenses. *Id*. at 214-15. He began downloading child pornography onto his computer. *Id*. at 215. Boyd's probation officer questioned Boyd about his computer use and announced that he would be visiting Boyd for a more thorough discussion. *Id*. Boyd then deleted many child pornography files in anticipation of that visit, and later admitted he did it to avoid detection. *Id*. at 217. The Sixth Circuit found that Boyd's deletion of the child pornography files was obstruction, as Boyd

knew his probation officer would be investigating his computer use before he deleted the files. *Id.* at 217-18.

In *United States v. Schwartz*, 698 Fed.Appx. 799 (6th Cir. 2017), Schwartz married and moved in with a woman who had a preteen daughter. *Id.* at 800. Schwartz subsequently drilled holes in the daughter's bedroom wall to film her in a state of undress. *Id.* Later, his wife found videos of the daughter on Schwartz' computer, and a confrontation ensued wherein she threatened him with prison. *Id.* About the same time, Schwartz contacted his pastor about his activities, and as they spoke the pastor warned Schwartz that the pastor was a mandatory reporter regarding sexual abuse. *Id.* Two days after the confrontation and after meeting with the pastor, Schwartz contacted Google to delete the account associated with storage and transfer of the child pornography images. *Id.* at 803. The Sixth Circuit affirmed the district court's application of the obstruction of justice enhancement, finding that Schwartz – through both his conversation with the pastor and his wife's threat that he was going to prison – was aware that an official investigation had either commenced or was about to commence, and thus his attempt to delete the Google account was obstructive. *Id.*

Furthermore, the deletion of cell phone records has also been the basis for an obstruction of justice enhancement. *United States v. Malki*, 609 F.3d 503 (2nd Cir. 2010). In *Malki*, the Court noted that several factors support the obstruction of justice enhancement, including Malki's deleting of cell phone records before he was interviewed by government agents. (*Id.* at 511).

While law enforcement cannot determine the date on which Mills deleted the content from his phone, the existence of the call log after the November 5, 2019 interview up through the date of seizure on November 7, 2019 supports the inference that Mills deleted his call log, as well as the other items, after speaking with agents on November 5, 2019. Regardless, "[o]bstructive

conduct that occurred prior to the start of the investigation…may be covered by this guideline if the conduct was purposefully calculated, and likely to thwart the investigation or prosecution of the offense of conviction." U.S.S.G § 3C1.1 App. Note 1. See also, *Malki*, at 511 (affirming increase for deleting cell phone and email records). Based on the evidence that Mills selectively deleted content regarding contact information for Individual-1, MMS messages with Individual-1, and his entire call log which included calls to and from Individual-1, it is reasonable to infer that Mills either acted purposely to obstruct the investigation after he became aware that it was underway or his conduct was done purposefully to thwart any future investigation or prosecution.

The government acknowledges that conduct which occurs contemporaneous to arrest should not be sufficient to warrant an adjustment unless it was material to the investigation. Where the obstructive conduct was not "contemporaneous with arrest", the government need not show that it materially affected the investigation. *United States v. Hinojosa*, 749 F.3d 407, 416 (5th Cir. 2014) (defendant's conduct was not contemporaneous with his arrest so unnecessary to show material effect on investigation.); *United States v. Micklin*, 89 Fed.Appx. 977 (6th Cir. 2004), vacated due to *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 Led.2d 621 (2005)(citing *United States v. Waldon*, 206 F.3d 597, 608 (6th Cir. 2000) for the position that the application notes indicate that "unsuccessful attempts at destroying or concealing evidence still fall within the mandate of U.S.S.G. § 3C1.1"). Here, Mills was not arrested at the time his phone was seized on November 7, 2019. (R.22, Transcript 5/24/21, PAGEID 248). Mills was first charged on this offense by way of Information on October 7, 2020. (R.2, Information). Thus, Mills' actions in deleting the contents occurred several months before any charges were filed and thus were not contemporaneous to arrest.

Even if the seizure of the phone had occurred contemporaneous to an arrest, the communications deleted by Mills were material to the investigation as it is defined in Application Note 6 of U.S.S.G. § 3C1.1. The contents of the communications relate to the direction, purchase, and payment of firearms through straw buyers which is information that would influence or affect the analysis of whether Mills aided and abetted the false and fictitious written statement on the ATF Form 4473. Furthermore, ATF has an open investigation into Individual-1. (R.22, Transcript 5/24/21, PAGEID 252). Agent Remick-Cook explained how the investigation related to Individual-1 were ongoing investigations not only with regards to the firearms but also with regards to individuals at Ruskin Road. (*Id.* at PAGEID 277-91).

Therefore, Mills' actions to delete contacts, MMS messages, and call logs relevant to Individual-1 and the firearms at issue in the criminal activity is, at a minimum, an attempt to destroy or conceal evidence. These actions amount to an obstruction of justice whether done in advance in order to thwart future investigations or whether done after law enforcement interviewed Mills in relation to the firearms used in the shooting of Det. DelRio. Thus, the obstruction enhancement should be applied.

## **CONCLUSION**

The nature and circumstances of this offense support a term of imprisonment within the government's calculated guidelines. Defendant was instrumental in purchasing several firearms that ending up in the hands of drug dealers who shot and killed a law enforcement officer. Defendant trafficked those firearms to Individual-1 with knowledge and reason to believe that they would have ended up in the hands of prohibited persons who were going to use them for nefarious purposes. Not three months passed between the original transfers to Wells and the recovery of

those firearms at a crime scene. Three firearms with three separate purchase dates all traveled the same route: Wells to Mills to Individual-1 to recovery at Ruskin Road.

Defendant's actions in buying these firearms were designed to insulate his involvement in the purchases of the three firearms recovered at Ruskin Road: he used Wells as a straw buyer despite knowing the laws against straw buyers, he paid extra to Wells to have him conduct the purchases, and he used extra effort to have a middleman (Wells) buy the firearms. Defendant knew the federal firearms laws from when he managed a gun store. He knew the need to insulate himself from the firearms and knew how to insulate himself from the firearms, which is why he took those extra efforts. His actions after being contacted by law enforcement further demonstrate his desire to insulate himself from the purchases: he was not cooperative with agents, he provided false information to agents despite knowing it is a federal crime, and he deleted relevant communication and contacts from his cellular phone.

Furthermore, Defendant's conduct has been obstructive from the beginning of the investigation: he provided false information to federal agents during the first interview, he provided additional false information to agents during the second interview, and he destroyed cell phone records which would have furthered the investigation into Individual-1 and the individuals located during the shooting at Ruskin Road.

Defendant's actions in committing this crime are more serious than others similarly charged. He trafficked in firearms despite knowing the firearms laws, and he took affirmative steps to insulate himself from the firearms based on this specialized knowledge. Furthermore, he purchased at least eleven firearms and potentially upwards of 20 lower receivers this way.

In conclusion, the government respectfully requests that the Court sentence Mills to a period of incarceration consistent with the government's calculated guideline range of 87 – 108

months.  A sentence consistent with the government's calculated sentencing guidelines range is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/Amy M. Smith
AMY M. SMITH (0081712)
Assistant United States Attorney
200 West Second Street, Suite 600
Dayton, Ohio 45402
(937) 225-2910
Amy.Smith2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a copy of this sentencing memorandum has been served upon Jonathan N. Fox, Esq., counsel for Defendant, via CM/ECF on this 6th day of July, 2021.

s/Amy M. Smith
AMY M. SMITH (0081712)
Assistant United States Attorney